In the Matter of the Alleged Dependent and Neglected Status of Z.Z., a Minor Child, and concerning K.Z., parent.

In the Matter of the GUARDIANSHIP OF Z.Z., a Minor.

Nos. 17560, 17632.

Supreme Court of South Dakota.

Considered on Briefs Feb. 12, 1992.

Decided Dec. 30, 1992.

Michael A. Porter, Hot Springs, for appellant mother, K.Z.

Lisa L. Kiser of Viken, Viken, Pechota, Leach and Dewell, Rapid City, for appellant grandfather, A.Z.

Mark Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for appellee State.

AMUNDSON, Justice.

Mother appeals from an order terminating her parental rights to her Son and giving the South Dakota Department of Social Services (DSS) full legal and physical custody of Son with full adoptive rights. Mother's father (Grandfather) appeals from an order denying his petition for guardianship of Son. Son's father voluntarily terminated his parental rights after paternity testing and has no part of this appeal. We affirm.

## FACTS

Mother is 23 years old. When she was 13 years old her parents began contemplating divorce. Since that time she has been involved with drugs and alcohol. Because of her problems with alcohol and drugs she has received in-patient treatment in North Dakota, South Dakota, Minnesota and Colorado, which has met with little success. She is now "treatment wise" and able to give information to make her appear genuine in treatment efforts. In reality, however, she continues to blame everyone but herself for her problems, and, during the pendency of this action continued to use alcohol and drugs to the extent that at one point she resorted to huffing "whiteout".

Because of her home, alcohol and drug problems, Mother left Hot Springs and lived with her grandparents to complete high school. She moved to Kansas City, had a series of boyfriends, and became pregnant. During her early pregnancy she continued to use cocaine and marijuana. Son was born on June 6, 1989.

Shortly after Son's birth, Mother developed severe religious delusions, confusion, feelings of paranoia, and behavioral disinhibition. She was hospitalized in the Colorado State Hospital's psychiatric unit for two

weeks. After her release on August 12, 1989, she returned to South Dakota where the behavior precipitating this action occurred. On August 20, she took Son to the Presbyterian Church, praised Satan during the services, and took Son to the altar following the service and continued her praise of Satan. Parishioners, worried that Mother would harm Son, contacted law enforcement and mental health officials.

Since that time, Mother has received inpatient psychiatric treatment in Rapid City and at the Mayo Clinic where she was diagnosed as suffering from bi-polar disorder, manic phase, and chemical dependence, primarily cocaine. Lithium improved Mother's psychosis. If she stays away from drugs and alcohol and continues to consistently take her medication the psychotic disorder should resolve itself. She has been unable, however, to abstain from drugs or alcohol or consistently take her medication.

Grandfather is 45 years old. He and Grandmother have taught school in Hot Springs for over twenty years. Although they claim they will divorce when their house sells, they have contemplated such an action for ten years and continue to live together. During the pendency of this action, Grandfather cared for Son part of the time and they do have a bond and a good relationship. Grandmother, while not neglecting or threatening Son, did little to care for Son. Much of the tension between Grandfather and Grandmother stems from their differing approaches to Mother, her problems, and the way social services has handled the case. Although he claims that he will keep Son from Mother if granted guardianship, (and he did so with one exception while he was Son's guardian), Grandfather has faith that Mother will solve her problems and believes that nobody has the right to take Son from her.

## I.

WHETHER TERMINATION OF MOTHER'S PARENTAL RIGHTS WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE?

The United States Supreme Court in *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960) stated:

> In a series of decisions this court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

This principle has been referred to at time as the "least restrictive alternative." Consequently, in a termination of parental rights at a dispositional hearing, the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interest and the state must show that there is no narrower means of providing for the best interests and welfare of the child. *In Interest of A.D.*, 416 N.W.2d 264, 267 (S.D.1987).

██ Mother admits that she is not a perfect parent. She loves Son, has bonded with him, and believes that she has cared for him appropriately. She claims that she is exhibiting a pattern of progress with her battle over drugs, alcohol, and mental illness.

Unfortunately, the record does not support her contentions other than it is clear that she loves Son. Mother has had a ten year struggle with drugs and alcohol. Voluntary and involuntary treatment has not met with success. Her battle with mental illness has not been as long-term, but she has exhibited the same inability to follow the medical procedures necessary to contend with it. In addition, she showed a lack of interest in her partial care program, a program designed to help the chronically mentally ill cope with independent living. Counselors, social workers, and doctors have found her prognosis poor. Her counselor found Mother's prognosis for staying drug and alcohol free "guarded to poor." Her therapist testified that Mother's progress in maintaining sobriety was minimal and that her pattern was to "move ahead a little bit and then make five steps back." Her psychiatrist testified that Mother's psychotic disorder would resolve itself if

she stayed away from drugs and alcohol, stayed very close to treatment programs, and consistently took her medication. Everything is contingent on Mother's abstinence from alcohol and drugs. Her track record is abysmal.[1]

▮ The best interests of the child must always prevail. *Matter of S.M.*, 384 N.W.2d 670 (S.D.1986). Children are entitled to a stable, healthy environment *now;* they are not required to wait for a parent to acquire parenting skills that may never develop.[2] *People in Interest of M.J.B.*, 364 N.W.2d 921 (S.D.1985). "We have repeatedly held, in a long line of cases, that the trial court's findings of fact cannot be set aside unless they are clearly erroneous and we are, after a review of all the evidence, left with a definite and firm conviction that a mistake has been made." *Matter of A.M.*, 292 N.W.2d 103, 105 (S.D. 1980).

Mother's problems are so overwhelming that she cannot care for herself, no less a child. When it appears "that all reasonable efforts have been made to rehabilitate the family, that the conditions which led to the removal of the child still exist and there is little likelihood that those conditions will be remedied so the child can be returned to the custody of the child's parents, the court shall affirmatively find that good cause exists for termination of the parental rights of the child's parents ..." SDCL 26–8A–26. The trial court did not err on this point.

II.

WHETHER GRANTING GRANDFATHER GUARDIANSHIP WAS AN ALTERNATIVE?

▮ We have affirmed the trial court's determination that the termination of Mother's parental rights was the least restrictive alternative available.[3] Under this circumstance, custody and guardianship of Son mandatorily vests with social services for the purpose of placing the child for adoption. SDCL 26–8A–27. Consequently, the issue Grandfather raises is moot. *See,*

---

1. For example, on July 3, 1990, Mother admitted herself to the psychiatric unit of Rapid City Regional Hospital after testing revealed drug and alcohol use. She was discharged July 6, 1990. On July 30, 1990, testing again revealed drug and alcohol usage. Mother admitted that she had been drinking steadily and that she had been arrested and placed in protective custody in Fall River County on several occasions. On August 31, 1990, Mother admitted herself to the Addiction Recovery Center. She checked out on September 2, 1990, returned drunk, and was readmitted. Two weeks later Mother stole correction fluid and was found huffing it. On September 28, 1990, Mother completed treatment. During the first week of October 1990, Hot Springs police received a report that Mother was drunk and causing problems in a bar. Testing on October 12, 1990, indicated Mother's use of alcohol. On October 15 Mother admitted to drinking two beers the prior Sunday. On October 29, 1990, a DSS worker saw Mother with a beer in her hand. DSS later received information that Mother was drunk that night. On November 11, 1990, Mother was arrested in Wyoming for public intoxication. On November 20, 1990, a complaint was filed against Mother for threatening an AA member when Mother was drunk. Mother's attorney then got her admitted to Friendship House. She was kicked out due to alcohol consumption. On January 16, 1991, Mother was arrested for disorderly conduct; testing revealed alcohol and drugs. On February 6, 1991, Mother was voluntarily admitted to Rapid City Regional for a medication check. She admitted she had been on a drinking binge for quite a while.

2. The petition in this case has been pending since August 1989 and Mother has received DSS services, drug and alcohol treatment, and mental health services since that time. At the dispositional hearing in March 1991 Mother's psychiatrist testified that Mother could possibly remain chemically free in two or three years. Son, who had already waited for this possibility for two years cannot and should not be required to wait another three years for something that may not happen then.

3. Much has been made of the fact that DSS recommended guardianship for Grandfather. The record reflects that DSS has not been inconsistent. DSS recommended termination of Mother's parental rights. If the trial court did not find that termination was the least restrictive alternative, DSS, as an alternative, recommended guardianship. The trial court, however, determined that termination of Mother's parental rights was the least restrictive alternative and that therefore Grandfather had no legal right to receive guardianship. Interestingly, the trial court also entered extensive findings to support its conclusion that denial of Grandfather's petition for guardianship is also in Son's best interest.

*Investigation of Hy. Const. Ind. v. Bartholow,* 373 N.W.2d 419 (S.D.1985).

Affirmed.

MILLER, C.J., and WUEST and SABERS, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

### BASIC POSITION

It is the position of this writer that the placement of legal custody with a guardian/relative (grandfather who dearly loves his grandson and has been the child's primary caretaker), with appropriate supervision by DSS, and subject to such other conditions as the Court may impose, *is clearly a lesser restrictive alternative;* as such, and as the evidence reflects in the record (not the slanted version of facts in the majority opinion), such a disposition would be commensurate with this little boy's best interests. Expressed another way, grandson should be with grandfather and grandmother, and not be put up for adoption, destroying this child's basic right to know and love his own flesh and blood; and the Statists should not be permitted to disassemble a family because the evidence supporting termination was not "clear and convincing" as defined in *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), thus eliminating fundamental personal liberties.

Majority decision expressly repudiates:

1. The best interests of the child; under *People in Interest of S.M.M.,* 349 N.W.2d 63 (S.D.1984), termination of parental rights is "a drastic, final step that should be exercised with great caution," and the best interests of the child in mind.

2. Application of the least restrictive alternative rule; authority: *Matter of C.L.,* 397 N.W.2d 81 (S.D.1986).

3. Outwardly distorts the facts concerning the grandmother's treatment of her grandson by using a conclusory, adjective phrase, i.e., a brush off reflecting "Grandmother, while not neglecting or threatening Son, *did little* to care for Son." (Emphasis added).

4. The extended family concept in families; (yes, the Negroes proudly have "Roots"); are white people entitled to this commendable trait? *See* CAVEAT, *Roots,* by Alex Haley, Double Day & Company, copyright 1976, Garden City, New York.

5. True facts herein, absolutely uncontroverted, that the DSS, through the social worker damaged (if not destroyed) State's case by (1) not seeking termination and said so and (2) suddenly whirled and reversed its decision, deciding to terminate. Findings of Fact entered below were "clearly erroneous" under People in the *Interest of M.K.,* 466 N.W.2d 177 (S.D. 1991).

6. And "hides" the true facts that the grandfather and grandmother had this little boy (diapers and all) for 15 of the first 20 months of his life. DSS was not there during the long nights, feeding formula, and rocking the baby. Babies need love, attention, and time. Grandfather was there; DSS worker was in her state office.

7. The "clear and convincing" evidence rule totally. *Santosky, supra.*

8. Fundamental personal liberties, thereby turning children into chattels of the state. *Santosky, supra.*

Here, the State champions the cause of the state, economically feeding a government "department,"[1] based its decision upon a federal money scheme (federal money flowing in for more state jobs) advocating in its brief that "THE BOY WOULD BE EASY TO ADOPT." Since when is that a determining factor? Obviously, that is not a good reason for separating a little tyke *forever* from his family. What kind of society have we become? Does this Court exist to exalt the state over the individuals? That is exactly the opposite of why we had the American Revolution!

---

1. Although the DSS (Department of Social Services) is dubbed a "Department," in reality it is an "agency."

What has become of the rights of free men? What is the basic unit of society? The *state* or the *family?* The core unit of society is the family—not the state. A *family* is the religious, social, and productive unit; a *family* is the most powerful institution in society, controlling in terms of biblical law, the key areas of society, *children,* property, and inheritance. Civilizations rise and fall, according to the nature of *family* life. The State, in its warfare against society, as depicted here, strikes most emphatically against the family and then the church. We (some of us) saw this develop in Italy, Germany, and China. Kill the family—kill the church—then the state—an inanimate institution steps in—to fill the void.

By erosion, it appears the core of society, as most of us in the early and middle 1900's witnessed and lived it, is destroyed. Today's society shifts responsibility *to others* and to the *state.* The state is to provide jobs, subsidies, freedom from worry and self-discipline; and yes, if a boy "would be easy to adopt," eliminate the boy from his grandfather and the grandfather from the boy. And likewise the grandmother. Mother, forever, shall never see her son. This is a cold, heartless decision. It is truly an espousal from cradle to the state to the grave. I cannot join it and, accordingly, I dissent.

Statists have their own supreme god—the State. They live by power and coercion. They implant fear in good men—men of freedom. They have no conscience and live by a false dogmatic "ism."

Here, regretfully the State's case is based upon: "Say, we are in the baby business and we have a nice, little baby boy, raised by his grandfather and he is easy to adopt. His mama has used drugs, alcohol, and has mental problems. You out there, do you want to adopt a nice little boy? We're in the baby business today!" Some parents are terrible to their children. When abuse is rampant and neglect is daily, society should involve itself to protect the child. I do not deny that; but, here, a dear grandfather, age 47, in good health, and a respected teacher, gave love, food, and care to his grandson. If one were to concede the mother was not a good parent, how can we blind ourselves to the fact that within this little boy's family, he had excellent care from a grandfather. By this decision, do we attain a social policy that a grandfather can no longer raise a grandson? Now, this Statist approach, would deny him *forever* his side by the very grandson he helped through the tough days of early infancy. It is written (yes, the Bible is a better guide than the DSS): "Have no fellowship with the unfruitful works of darkness, but rather reprove them." Ephesians 5:11–13. I reprove.

## PERTINENT FACTS, PROCEDURE, AND LAW

Cast in a light favorable to the Mother, and supported by the records, she has made significant improvements in her life and personal well-being. Antipsychotic medications such as Lithium have proven beneficial in improving and stabilizing her psychological condition. Mother's efforts at abstinence from drugs and alcohol, although clouded with normal episodes of denial and occasional relapses, have also met with slow but steady progress.

Mother's progress is clearly reflected in the record and accompanying exhibits. In August of 1989, Mother experienced a psychotic episode that was the genesis of this case. At that time, she flatly denied that she had any psychological condition, chemical dependency or otherwise and despised the fact that she was "voluntarily" admitted into Rapid City Regional Hospital. A short time after her admission into Rapid City Regional Hospital, Mother began to see that her behavior was not normal and also began to feel that the efforts of Dr. Manlove and the hospital staff were counter-productive to her recovery. Mother subsequently transferred to St. Mary's Hospital in Rochester, Minnesota (Mayo Clinic). After less than one month at the Mayo Clinic, Mother had progressed to the point where she could safely be discharged and sent home. While at home, Mother's condition improved still further, until she was allowed temporary custody of Z.Z. sev-

eral days each week, with minimal supervision, not by DSS but by the child's maternal grandparents. Eventually, Mother progressed to the point that she was given full physical custody of the child.

After approximately one month of having full custody of Z.Z., Mother, who was by now living with the child in her own apartment, began to feel the stirrings of emotional difficulties. On July 3, 1990, Mother took Z.Z. to Grandparents and then contacted DSS worker Damba. After Mother informed DSS of the situation, she voluntarily admitted herself into Rapid City Regional Hospital. This was a giant step which Damba admitted was a responsible one and agreed it was a remarkable step from where Mother was in December 1989.

Several weeks after her release from the hospital, Mother recognized that her psychotic episodes were related to her chemical dependence, and admitted herself into the Addiction Recovery Center at Rapid City Regional Hospital. As mentioned above, Mother completed this program with marginal success due primarily to the reactionary denial of her condition.

Notwithstanding Mother's occasional setbacks, her efforts met with progress. Progress that was ignored by the trial court, but which should not be ignored by this Court. People do come back from drug usage and alcohol. All of us must recognize that rehabilitation is a goal and a grace. Mother's treating psychiatrist, Dr. R.P. Renka, testified at the Dispositional Hearing that if Mother stays away from drugs and alcohol her prognosis for resolution on her psychosis is "excellent."

Dr. Renka went further to say that Mother's psychosis has already resolved and has "become a lot easier to work with." Dr. Renka further opined that if Mother would refrain from drug and alcohol use and learn to take care of herself, he would have "no reason to think she couldn't take care of the child." Therefore, this young mother is trying—trying to rid herself of drugs and alcohol.

With evidence such as this in the record, the trial court's conclusion that the involuntary termination of the parental rights of Mother over the little boy was supported by "clear and convincing evidence," is clearly in error. As we have held, and as I mentioned above, termination of parental rights is "a drastic, final step that should be exercised with great caution" and with the best interests of the minor child in mind. *People in Interest of S.M.M.*, *supra*. The evidence presented to the trial court was not that which was so clear, direct, weighty, and convincing that it could reasonably allow a trier of fact to reach a clear conviction that the permanent separation of this child from his mother was in his best interests. As such, the trial court was clearly erroneous in concluding that the evidence supporting termination was clear and convincing. Consider this: In a report to the trial court, dated November 17, 1989, submitted by DSS worker Akin, Akin noted: "... [i]t is clearly evident ... that [Mother] has a lot of concern and love for her child. Z...." Ms. Akin went on to report to the trial court that "Z.Z. remains in placement with the [Grandparents]," who "are doing *exceptionally well* in caring for Z.Z." and that the "Department of Social Services feels very comfortable having Z.Z. remain in the [Grandparents] home." (Emphasis added mine). To that end, DSS recommended that placement of Z.Z. remain with Grandparents. This recommendation was continually made and followed until the Report to the Court dated April 20, 1990, wherein DSS worker Damba recommended that Mother be given physical custody of the child on Tuesday, Wednesday and Thursday of each week so long as *Grandparents* maintain reasonable telephone contact with Mother while she has custody of Z.Z. Author's note: Is this clear and convincing evidence for termination? Citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982), the Supreme Court of South Dakota explained:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when

blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

*People in Interest of S.L.H.*, 342 N.W.2d 672, 677 (S.D.1983).

"State intervention for the best interest of the child cannot be used merely to insure that the child has a better home or someone better to care for it." *Matter of B.E.*, 287 N.W.2d 91, 97 (S.D.1979). Taking this little boy away from grandpa and grandma, is not in his best interests. In fact, "It is hazardous to assume that removing a child from an imperfect home invariably will benefit the child ..." *People in the Interest of S.M.M., supra.* Trying to paint grandpa and grandma as unfit custodians of this little boy is not in keeping with the record herein. It is simply untrue. Apparently, it is the majority's stance that Z.Z. should be removed from grandpa and grandma's home because it is not "perfect." Under the majority decision, he will be immediately thrust into a foster home with strangers. Foster homes are not "perfect." Unquestionably, he will be terrified. Then, he will ultimately be adopted. There was no clear and convincing evidence that termination of mother's parental rights was the least restrictive alternative.

The determining question here is: What is in the best interest of Z.Z.? SDCL 26–8–36. *People in Interest of S.L.H.* at 676. Our standard of review is "whether the trial court's ultimate finding—that clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests—were clearly erroneous." *People in Interest of K.C.*, 414 N.W.2d 616 (S.D. 1987); *Matter of A.H.*, 421 N.W.2d 71 (S.D. 1988). The trial court's determination must be supported by clear and convincing evidence. *In Interest of S.L.H., supra.* In my opinion, it was not.

Additionally, another Report to the Court, dated June 8, 1990, written by DSS worker Damba, informed the trial court that Mother has been providing the primary care for Z.Z. with supervision of Grandparents. Ms. Damba continued to state that "It is apparent that [Z.Z.], is attached to [Mother], as is [Mother] to [Z.Z.]," and, "It is evident that [Mother] can physically care for [Z.Z.]." Based in part upon this Report to the Court, the court, after a review hearing on June 8, 1990, granted Mother full physical custody of Z.Z. Thereafter, Mother retained full physical custody of Z.Z., supervised by DSS, until July 3, 1990, when she voluntarily admitted herself into Rapid City Regional Hospital. Z.Z. was then placed in a foster home because Grandmother was indecisive about the role she wanted to play in the raising of Z.Z. and because she felt that foster placement of Z.Z. could perhaps demonstrate to Mother the effects her actions were causing.

The child remained in foster care only until October 12, 1990 when, upon DSS' recommendation, the trial court granted physical custody to Grandfather for a two week trial period. On November 2, 1990, the court, again on DSS' recommendation, granted physical custody of Z.Z. to Grandfather "as long as it remains in the child's best interests." The child remained in Grandfather's custody. In her final Report to the Court, dated March 1, 1991, DSS worker Damba continued to recommend physical placement of Z.Z. with Grandfather. *Until March 4, 1991, DSS had found Grandfather's physical custody of Z.Z. to be in Z.Z.'s best interests for a total of approximately fifteen (15) months!*[2]

On at least two occasions during the time Grandparents had physical custody of Z.Z., both the Deputy State's Attorney and DSS personnel approached Grandparents about pursuing a guardianship over Z.Z. At that time, Mother had been showing progress and Grandparents chose not to pursue guardianship. It was after Grandfather regained physical custody of Z.Z. on No-

---

**2.** Per State's Exhibit 4, page 2, the little boy, while with Grandfather, was thriving, growing

and developing at a normal rate.

vember 2, 1990, and *before* the State's decision to seek termination of parental rights, that he retained the services of legal counsel and filed his verified Petition for Guardianship of Z.Z.

On the two occasions when the State had been the one to suggest a guardianship, neither DSS nor the State's Attorney raised any concerns regarding Grandparents' fitness as guardians. However, once Grandfather filed his Petition seeking guardianship, DSS worker Damba suddenly began raising concerns about Grandfather's fitness to be guardian of Z.Z. As DSS worker Damba indicated at the Dispositional Hearing, she has concerns regarding Grandparents' living arrangements; two prior referrals that DSS had received, at least seven years ago, regarding Grandparents' relationship with Mother; Mother's potential access to the minor child; and Damba's perception of Grandfather's alleged alcohol dependency. Grandfather was not an alcoholic; he did drink and, believing he should not, went to an outpatient program. He went to "counselling regimens." He also sought counselling with Dr. James Snow. It does not appear that Grandparents' relationship was a stormy one, laden with arguments and fights, nor is there an indication that Grandmother has ever neglected any of Z.Z.'s needs or that she has ever been a threat to him. Admittedly, there was a strained relationship between Grandfather and Grandmother. Evidence reflects that for seven months immediately prior to the Dispositional Hearing, Grandfather was the absolute primary caretaker of Z.Z. Moreover, that Z.Z. established a continuous, stable, caring relationship with Grandfather. However, the record is void of any instances when DSS felt that Grandfather's care of Z.Z. was lacking or that Grandfather's custody of Z.Z. was not in Z.Z.'s best interests. Rather, it was DSS' opinion that Grandfather is *"doing a good job taking care of Z.Z.,"* and that Grandfather has been *"very cooperative"* with DSS. (Emphasis added mine). Under SDCL 25–4–52, "The circuit court may grant grandparents reasonable rights of visitation with their grandchild, with or without petition by the grandparents, if it is in the best interests of the grandchild." However, under SDCL 25–4–54, 25–4–52 does not apply if the child has been placed with a person other than the child's parent or grandparent. In *King v. King,* 828 S.W.2d 630 (Ky.1992), the highest court of Kentucky upheld the grandparent visitation statute authorizing a Kentucky court to grant reasonable visitation rights to either maternal or paternal grandparents, holding that such a statute was constitutional. In the Kentucky case, the trial court found that the best interests of the child would be served by allowing parental grandparents the right of visitation. The United States Supreme Court denied a writ of certiorari, —— U.S. ——, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992). There was, however, no question concerning the child's safety in the grandfather's home and that the child would receive proper care during visitation. Under our state law, as reflected by the statute cited above, grandparents in South Dakota have the right of reasonable visitation providing it is in the best interests of the grandchild. In my opinion, the trial judge's factual determination in the case before us was clearly erroneous. In *King,* at 631, the Kentucky court expressed: "Under ordinary circumstance, few would dispute that there are benefits to be derived from the establishment of a bond between grandparent and grandchild."

DSS worker Damba's concern, regarding the referrals, revolved around one referral received on December 30, 1984, and one referral received on July 24, 1985. Years prior to the present scenario. The 1984 referral alleged threatening and abusive language and "emotional maltreatment" of Mother by Grandmother. The 1985 referral alleged that, as a result of an argument between Mother and Grandfather, Grandfather struck Mother. This little boy's best interests should not be lost in an isolated scenario. His time is now. He needs his biological family now. He should not be shipped out to strangers. Furthermore, with respect to the referrals, (1) no evidence substantiated the allegations and (2) the DSS never involved itself beyond the

referrals. The point is: These allegations should not prevent this little boy from being raised by his own flesh and blood. This little boy has not been physically, mentally, or psychologically abused. He should not be consigned to a netherworld of institutional care or a foster family. According to the evidentiary showing below, Z.Z. has "bonded" with his grandfather. *See,* State's exhibit 11, page 2, and State's exhibit 12, page 12. Factually, this case simply does not fit into a situation where a little boy has been abused or neglected.

DSS had a concern over unsupervised contacts with the little boy by his Mother. This fades under the sunshine of truth. In 15 months that the boy was in the home of his grandfather and grandmother, his Mother had unsupervised contact with him but once; this consisted of two to three minutes when she stopped by to pick up a key to her apartment. This is, allegedly, a great sin in the eyes of the DSS worker; it was used as an example to prove to the trial court that Grandfather was a bad guy for permitting this. However, this transpired as he held the bottle to feed the baby boy. When I read this type of Statist aggression/persuasion, I recoil. Grandfather, feeding the little boy, was the good guy. DSS wanted Grandfather to take parenting classes with the West River Mental Health Service. He did it; in fact, each and every suggestion or program the DSS recommended, Grandfather accomplished. DSS found Grandfather followed a case service plan.

Notwithstanding this pick and peck philosophy by counsel for the State, two reports to the trial court impale the State's case: (1) the January 25, 1991, report by DSS worker Damba that the grandfather "... has cooperated fully with Department of Social Services in all requests" which recommended the continued placement of the little boy with his grandfather (2) the March 1, 1991, report by DSS worker Damba *recommended that the grandfather* (who was again complimented for his salu-

tary efforts) *seek a guardianship to place the little boy in the grandfather's home.*

Why did the DSS permit this little boy to remain with the grandfather for many months if it did not believe in the grandfather's goodness? Why would it recommend that the grandfather set about obtaining a legal guardianship unless it believed the grandfather was an excellent man to have custody of his grandson? And the date of this recommendation was on the day of the dispositional hearing! *State should be bound by its findings, recommendations, and reports to the court.* These reports were submitted into evidence. State should be bound by its evidence. It cannot elevate its position over its own exhibits. Exhibits are evidence, and State is bound by its position. *See, Marnette v. Morgan,* 485 N.W.2d 595 (S.D.1992); *Klatt v. Continental Insurance Co.,* 409 N.W.2d 366, 370 (S.D.1987); *Romey v. Landers,* 392 N.W.2d 415, 421 (S.D.1986); *Miller v. Stevens,* 63 S.D. 10, 17, 256 N.W. 152, 155 (1934); 30 Am.Jur.2d Evidence § 1087 (1967).

## LEGAL CONCLUSION

If a child's best interests can reasonably be insured by a less intrusive measure, a trial court is required to employ that measure or measures *before* terminating parental rights. *In Re B.E.,* 287 N.W.2d 91 (S.D.1979). Here, it was not done. Clearly, the establishment of a guardianship with the grandfather and grandson was a lesser intrusive measure. Note the applicable statute set forth, in extenso, below. Guardianship is mentioned twice; guardian is mentioned once. In such a legal context, the state had a realistic opportunity to watch over Z.Z.'s best interests. Under South Dakota law, a guardianship is clearly a recognized legal mechanism to reject termination because it is specifically referred to in our former statute, SDCL 26-8-35, which has been incorporated into SDCL 26-8A-22.[3] Trial court, quite frankly, got the

---

**3.** Assuming, for purposes of academic hypothesis, as the majority would have us believe, that the parental rights of mother were involuntarily terminated; such a posture does not eliminate the concept that, firstly, a review of the evidence reveals that the least restrictive alternative, commensurate with Z.Z.'s best interests, was to grant the guardianship over Z.Z. unto his grand-

cart before the horse.[4] And so does the State's appellate counsel. First, the parental rights were terminated; then, having accomplished this, the State argues: It is too late for guardianship because a final decree of distribution has been entered, under SDCL 26–8A–27, and the court must therefore "... vest the department of social services with the custody and guardianship of the person of child for the purpose of placing the child for adoption ..." The legal mechanism was wrongfully shunned. This statute, concerning the least restrictive alternative should not be brushed aside:

> **SDCL 26–8A–22. Final decree of disposition—Permitted disposition when parental rights not terminated.** On completion of the dispositional phase of the proceeding, the court shall enter a final decree of disposition. *If the final decree of disposition does not terminate parental rights, the decree shall include one or more of the following provisions which the court finds appropriate as the least restrictive alternative available:*
>
> (1) *The court may place the child in the custody of* one or both of the child's parents, *a guardian,* a relative of the child or another suitable person, or a party or agency, with or without protective supervision, or the department of social services without a court approved plan for long-term foster care, subject to the conditions and the length of time that the court deems necessary or appropriate;
>
> (2) *The court may place the child in the custody of the department of social services or a child placement agency or in a foster home or other child care facility for long-term foster care under a court approved plan which names a specific foster home, with or without guardianship of the*

*child,* until the child attains the age of majority or until an earlier date or event as determined by the court;

> (3) The court may order that the child be examined or treated by a physician or by a qualified mental health professional or that the child receive other special care and may place the child in a suitable facility for such purposes under conditions that the court deems necessary or appropriate. On completion of the examination, treatment or hospitalization and on a full report to the court, the court shall conduct a supplemental dispositional hearing or hearings and shall make disposition of the child as otherwise provided in this section or, if the evidence shows need, the court may consider termination of parental rights as an appropriate possible alternative in keeping with the best interests and welfare of the child.
>
> *If disposition of the child under this section involves the removal from or nonreturn of the child to the home of the child's parents, guardian or custodian* and placement of the child in the custody of the department of social services for placement in foster care, *the court shall include 'in the decree a written judicial determination that continuation of the child's placement in the home of the child's parents, guardian or custodian would be contrary to the welfare of the child and that reasonable efforts were made by the department of social services to prevent or eliminate the need for removal of the child from the home and to make it possible for return of the child to the home.*

Clear and convincing evidence that termination was the least restrictive alternative commensurate with the best interests of the child? No. *In the Matter of S.H.,* 337

---

father, a respected teacher in the Hot Springs School District.

**4.** Footnote 3 of the majority opinion does not militate in favor of the majority's legal stance. It simply fails to recognize the error committed by the trial court, i.e., trial court failed to *first* consider the least restrictive alternative. This is

exemplified by Conclusion of Law II (in the guardianship action): "THAT the Court, having terminated the parental rights of K.Z. over Z.Z. in Fall River County Juvenile File Dependency and Neglect No. 90–6, the Petitioner, A.L.Z., has no right to maintain an application for a Petition for Guardianship over Z.Z."

618

N.W.2d 179 (S.D.1983), this Court defined "clear and convincing" evidence as being:

> ... evidence that is so clear, direct, weighty, and convincing so as to allow a trier of fact to reach a clear conviction of the precise facts at issue without testimony as to their truth.

*People in the Interest of H.M. and S.M.,* 474 N.W.2d 267 (S.D.1991). State did not meet its proof in the (a) termination proceeding or (b) guardianship proceeding which was dismissed. The guardianship standard is set forth in SDCL 30–27–19:

> In awarding the custody of a minor or in appointing a general guardian, the court or judge is to be guided by the following considerations:
> (1) By what appears to be for the best interests of the child in respect to its temporal and its mental and moral welfare; and if the child be of a sufficient age to form an intelligent preference, the court or judge may consider that preference in determining the question; ...

In the termination proceedings, trial court erred because it entered Findings of Fact which were clearly erroneous, *Matter of A.M.,* 292 N.W.2d 103 (S.D.1980), as the evidence was not clear and convincing; and mistakes of law in its Conclusions of Law in that placing this child for adoption by the DSS was not the least restrictive alternative. *Santosky v. Kramer, supra.* In the guardianship, trial court abused its discretion (obviously a different standard of review). An abuse of discretion exists if the decision (on guardianship) is *against reason and evidence.* It is not in the best interests of this little boy to be placed with DSS for adoption. He is now three years old; he has bonded with the grandparents. All during the pendency of this action, grandpa and grandma have fed him, watched over him, comforted him, put him to bed. He is *now* with the grandparents. Nearly three years have passed since the adjudicatory hearing; it has been twenty months (nearly two years) since the dispositional hearing. The trauma to this child, to uproot him *now,* will be monumental.

Would, if I could, break open the closed microcosm of the mind and open the heart thereby exposing this case for what it is: A grandfather who gave all of his energy and heart to hold onto the dearest treasure about him, his grandson. A grandchild who will be torn away from the only family he has. Acute emotional distress will be inflicted upon him. Grandpa, your efforts were salutary and noble. When a state agency would deprive you, and your grandson, of a family heritage, you by-passed complacency. You fought for the constitutional rights of yourself and your grandson. The Statists, believing government is supreme, destroyed your American dream.

Governmental costs of caring for children have soared. This little boy will be placed for adoption (tragically). The DSS total expenditures for last year (FY '92, ending June, 1992) was $1,142,320.00 for adoptions which includes $943,209.00 for children in adoption proceedings requiring special needs; there was, also, $199,111.00 spent for DSS staffing in connection with adoptions. These figures were garnered by this Justice from the DSS budget books which I have perused. Further, *prior to adoption,* "foster care" will be required for Z.Z. From the same budget, I also take judicial notice of these figures: $5,394,-490.00 (for children placed in foster care families); "foster care" includes "in home" and "group, residential homes"; "foster care" now costs the taxpayers $4,081,-490.00 ("support services" for "foster care"). Medical care and travel alone costs $1,313,000.00. Total: $5,394,490.00 (i.e., way over 5 million dollars for one year!). Yes, adoptions and group care are big business in South Dakota. These figures do not include over $2 million for "abused, neglected" children, which includes almost $1 million for social workers. Nor do these figures include the Unified Judicial System for "alternative care" of $1,681,881.00 for adjudications and $21,255.00 for "support services," for a total of $1,703,135.00 (author's perusal of U.J.S. budget for one year, ending June, 1992). All in all, there is over $10,000,000.00 spent in taxpayers' money. These figures seem unbelievable but they are truth. Knowledge begins with truth.

## CAVEAT To "ROOTS"

From the jacket of "Roots," *supra*, I wish to quote:

When he was a boy in Henning, Tennessee, Alex Haley's grandmother used to tell him stories about their family—stories that went back to *her* grandparents, and *their* grandparents, down through the generations all the way to a man she called "the African." She said he had lived across the ocean near what he called the "Kamby Bolongo" and had been out in the forest one day chopping wood to make a drum when he was set upon by four men, beaten, chained and dragged aboard a slave ship bound for Colonial America.

Still vividly remembering the stories after he grew up and became a writer, Haley began to search for documentation that might authenticate the narrative. It took ten years and a half a million miles of travel across three continents to find it, but finally, in an astonishing feat of genealogical detective work, he discovered not only the name of "the African"— Kunta Kinte—but the precise location of Juffure, the very village in The Gambia, West Africa, from which he was abducted in 1767 at the age of sixteen and taken on the Lord Ligonier to Maryland and sold to a Virginia planter.

Haley has talked in Juffure with his own African sixth cousins. On September 29, 1967, he stood on the dock in Annapolis where his great-great-great-great-grandfather was taken ashore on September 29, 1767. Now he has written the monumental two-century drama of Kunta Kinte and the six generations who came after him—slaves and freedmen, farmers and blacksmiths, lumber mill workers and Pullman porters, lawyers and architects—and one author.

But Haley has done more than recapture the history of his own family. As the first black American writer to trace his origins back to their roots, he has told the story of 25,000,000 Americans of African descent. He has rediscovered for an entire people a rich cultural heritage that slavery took away from them, along with their names and their identities.

But Roots speaks, finally, not just to blacks, or to whites, but to all peoples and all races everywhere, for the story it tells is one of the most eloquent testimonials ever written to the indomitability of the human spirit.

Mahatma Gandhi, the great Indian philosopher, pacifist, and freedom lover once said: "Life is pain." Here, life and family roots are uncalled-for pain.

No legal or familial quest is born in luxury; it is born in discomfiture or outrage and often in suffering because of an actual or perceived wrong. A great society is, in my opinion, birthed in pain. So it was with America. Land of the free?