708 N.W.2d 673 (2005)
2005 SD 120
In the Matter of S.A., A.A., E.A., and A.A., Alleged Abused/Neglected Children.
Nos. 23473, 23488.
Supreme Court of South Dakota.
Argued October 3, 2005.
Decided December 7, 2005.
*674 Amanda M. Wilcoxon, Minnehaha County Public Defender's Office, Sioux Falls, for appellant Mother H.A.
Richard L. Johnson, Sioux Falls, for appellant Father H.A. (E.A., Sr.).
Lawrence E. Long, Attorney General, Ann M. Holzhauser, Assistant Attorney General, James E. Carlon, Special Assistant *675 Attorney General, Pierre, for appellee State of South Dakota.
Cynthia A. Howard, Minnehaha County Office of the Public Advocate, Sioux Falls, for appellee Minor Children.
ZINTER, Justice.
[¶ 1.] The circuit court adjudicated S.A., A.A., E.A. Jr., and A.A. abused and neglected children. After dispositional hearings, the circuit court terminated the parental rights of H.A. (Mother) and H.A. (Father). Father appeals the trial court's determination that the children were abused/neglected. Both Mother and Father appeal the trial court's termination of their parental rights. We affirm.

Facts and Procedural History
[¶ 2.] Mother and Father are the parents of four children: S.A. (daughter, age 11), A.A. (daughter, age 9), E.A. Jr. (son, age 9), and A.A. (daughter, age 5). On February 21, 2003, E.A. Jr.'s school principal, Jackie McNamara, observed marks on E.A. Jr.'s neck behind his ears and on his back. When Ms. McNamara asked about the marks, E.A. Jr. responded that Mother hit him when he did not want to go to bed.
[¶ 3.] Ms. McNamara called the Department of Social Services (DSS). Liana Van Ormer, along with police officers Johnson and Colwill, photographed the injuries and interviewed E.A. Jr. He told Ms. Van Ormer that the injuries were caused by Mother hitting him. Dr. Kaplan later examined E.A. Jr. and opined that E.A. Jr.'s injuries were consistent with the child's hitting explanation. However, Dr. Kaplan thought the injuries were caused by a "geometric object," rather than a hand.
[¶ 4.] The police placed the children in protective custody at the Children's Inn, a domestic abuse shelter. While at the Children's Inn, the children were interviewed and participated in counseling. During the interviews and counseling sessions, the three older children shared numerous stories of other abuse, indicating that they had been hit with belts, flyswatters, and spatulas.[1]
[¶ 5.] At the adjudication hearing, both Mother and Father denied that they used any type of physical discipline with their children. Father also relied on the testimony of Mariann Johnson, a family friend and daycare provider. Both Johnson and Father stated that they did not notice marks on E.A. Jr.'s neck on the morning in question. The trial court, however, after hearing all of the evidence, found clear and convincing evidence that the children were abused/neglected.
[¶ 6.] After the adjudicatory hearing, and while still in protective custody, the children continued to disclose further instances of abuse and neglect in the home. The children disclosed not only instances of child abuse but also abuse between the parents. Furthermore, S.A. told one of the counselors that she babysat the youngest child A.A. "a lot" and had to watch for the police while Mother and Father shoplifted. S.A. also revealed that Father had told her to keep the fighting between Mother and Father and the abuse of the children a secret.
[¶ 7.] Another disclosure occurred when S.A. and Tara Olson-Larson, a licensed children's therapist, were looking at a book regarding foster care, abuse, and the legal *676 system. During this counseling session, S.A. turned the book back to a page on sexual abuse and asked, "what if this happened to me?" S.A. then told Ms. Olson-Larson that when S.A. was about eight or nine, Father came home intoxicated while she was getting ready to take a bath, and he touched her in her private area. After making this statement, Colleen Brazil, a forensic interviewer, talked with S.A. In a videotaped interview, S.A. told Brazil the same story, indicating that Father got on his knees and touched her with his tongue on her skin and inside her private area.[2]
[¶ 8.] Notwithstanding the children's numerous allegations, Mother and Father denied that they ever physically abused the children. They also denied that there was any abuse between them or that they fought in front of the children. DSS, however, established a history of domestic abuse. One incident occurred in 2001 when Mother actually called the Children's Inn, reported domestic abuse by Father, and stated that he hit her and was angry all the time. Further, on October 3, 2003, while this case was pending, Mother and her attorney met with DSS and the Children's Inn. On this occasion, Mother indicated that Father was emotionally, verbally, and physically abusive for the last 10 years and that she was scared but felt "stuck."[3] She also suggested that Father caused the injuries to E.A. Jr. but felt the children were blaming her because they were afraid of him. Significantly, even after being confronted with documented evidence of domestic abuse, Mother and Father continued to deny all allegations of physical abuse between them and claimed the police reports were false. Mother even denied the 2003 incident at the Children's Inn, claiming DSS and the Children's Inn "misunderstood" her.
[¶ 9.] After the trial court found the children abused and neglected, DSS attempted to work with the parents to return the children to the home. Although Mother and Father completed many of the necessary requirements, the professionals that provided the services indicated that the parents were being untruthful. The professionals recommended that Mother and Father's parental rights be terminated.[4]
*677 [¶ 10.] At the dispositional hearing, Mother and Father claimed that they were not given a fair opportunity to demonstrate what they had learned through the counseling sessions and other services. The trial court, however, found that DSS had already made reasonable but unsuccessful efforts to rehabilitate the family. The court relied in part upon the parents' untruthfulness in denying any physical abuse between the two of them and with the children even when confronted with overwhelming evidence to the contrary. Therefore, the court found the conditions that led to the removal of the children remained with little likelihood that they would be remedied. The court ultimately found that termination of parental rights was the least restrictive alternative and in the best interests of the children. On appeal, Father raises the following issue:
(1) Whether the trial court's finding of abuse and neglect was supported by clear and convincing evidence.
Mother and Father jointly raise the following issues:
(2) Whether the trial court erred in admitting hearsay statements of the children; and
(3) Whether termination of parental rights was the least restrictive alternative and in the best interests of the children.

Analysis and Decision

Finding of abuse and neglect
[¶ 11.] We review the trial court's findings of fact under the clearly erroneous standard; therefore, they will not be set aside unless "we are left with a definite and firm conviction that a mistake has been made." People ex rel. J.S.B., Jr., 2005 SD 3, ¶ 12, 691 N.W.2d 611, 615 (citing In re T.H., 396 N.W.2d 145, 148 (S.D.1986)). We also give due regard to the trial court's opportunity "to judge the credibility of the witnesses." Matter of D.H., 354 N.W.2d 185, 188 (S.D.1984).
[¶ 12.] The State has the burden of proving that the children were abused or neglected by clear and convincing evidence. People ex rel. D.T., 2003 SD 88, ¶ 5, 667 N.W.2d 694, 697 (citing Matter of J.A.H., 502 N.W.2d 120, 123 (S.D.1993)). Father contends that because of inconsistencies in the testimony[5] there was not clear and convincing evidence that the children were abused and neglected. Although there was inconsistent evidence presented at the adjudicatory hearing, those inconsistencies were considered by the trial court. Furthermore, the trial court's findings were based on the credibility of the parents and other witnesses. The trial court specifically noted that it was able to judge the credibility of the parents who testified and was able to view E.A., Jr.'s videotaped interview with Ms. Brazil. The trial court ultimately found that "[t]he videotape of [E.A., Jr.] giving his version of the events to Ms. Brazil [was] ultimately ... the most compelling piece of evidence presented. In it, the Court ha[d] the opportunity to judge for [itself, E.A., Jr.'s] credibility in giving his story."
*678 [¶ 13.] After reviewing the record and giving due regard to the trial court's opportunity to judge the credibility of these witnesses, we cannot conclude that the trial court's findings were clearly erroneous. Rather, the marks on E.A. Jr., his volunteered statement to his principal, the statements of the other children, the testimony of the professional service providers, and E.A. Jr.'s videotaped interview all support the finding of abuse/neglect.

Hearsay Statements of the Children
[¶ 14.] Mother and Father argue that because the children's statements were introduced through counselors and interviewers,[6] they were denied the opportunity to cross-examine the children. Although the parents concede that the statements were admissible under the rules of evidence,[7] they contend that admitting the children's hearsay statements violated their constitutional right to due process because they did not have the opportunity to cross-examine the children. A violation of a constitutionally protected right at trial presents a question of law, which is reviewed de novo. State v. Carothers, 2005 SD 16, ¶ 7, 692 N.W.2d 544, 546 (citations omitted).
[¶ 15.] The United States Supreme Court has clearly stated that natural parents have a fundamental liberty interest in the care, custody, and management of their children. Lassiter v. Department of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640, 649-50 (1981); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606. As a result, parents are guaranteed procedural rights under the Fourteenth Amendment when parental rights are subject to termination:
If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.
Santosky, 455 U.S. at 753-54, 102 S.Ct. at 1395, 71 L.Ed.2d at 606.
[¶ 16.] Parents argue that use of the children's "testimonial" hearsay was fundamentally unfair. They rely upon the Supreme Court's recent restriction on the use of testimonial hearsay in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crawford held that under the Confrontation Clause of the Sixth Amendment, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 541 U.S. at 68-69, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.
*679 [¶ 17.] However, the parents' reliance on Crawford is misplaced because Crawford only interpreted the Sixth Amendment right to confrontation in criminal cases: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI (emphasis added). And, "[p]rocedures determining the custody of dependent children are not criminal, are not quasi-criminal, but instead constitute a civil action, or a special proceeding of a civil nature." People in Interest of G.R.F., 1997 SD 112, ¶ 17, 569 N.W.2d 29, 33 (quoting In re C.J.H., 371 N.W.2d 345, 349 (S.D.1985)). Therefore, the Crawford analysis involving the Sixth Amendment right of confrontation in criminal cases is not applicable in this civil abuse and neglect proceeding.[8]
[¶ 18.] Although the Sixth Amendment right of confrontation does not apply, parents argue that they were impermissibly denied the right to confront and cross-examine the children under the Due Process Clause of the Fourteenth Amendment. However, it is unnecessary to undergo a due process analysis because these parents were not denied the opportunity to cross-examine the children. Instead, the lack of cross examination was due to their decision not to question the children.
[¶ 19.] In this case, the State gave the parents pretrial notice of its intent to use the hearsay statements in accordance with SDCL 19-16-39. Thereafter, although both Mother and Father had the opportunity to subpoena the children at the adjudicatory hearing, neither chose to do so.[9] Furthermore, the parents were obviously aware of their "opportunity" to cross-examine because Mother did subpoena the children at the dispositional hearing. However, the parents only chose to question *680 S.A. and voluntarily declined the court's offer to question the other children. Although the trial court did limit the topics that S.A. could be questioned on, neither Mother nor Father objected to the trial court's limitations.
[¶ 20.] When confronted with a similar failure to exercise the opportunity to challenge hearsay through cross examination, a Minnesota Court of Appeals observed:
The right to cross-examine witnesses is part of the general guarantee of due process. In re Welfare of J.W., 391 N.W.2d 791, 794 (Minn.1986) (citing Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). But `it is an established element of trial court discretion in personal welfare cases to admit written materials as hearsay evidence, provided that the affected parties have an opportunity to dispute the material, either by calling the authors of those reports as witnesses or otherwise responding.' In re Welfare of D.J.N., 568 N.W.2d 170, 175 (Minn.App.1977) (citing Stanford v. Stanford, 266 Minn. 250, 258, 123 N.W.2d 187, 192-93 (1963)). The record establishes that mother was aware before trial that the CFASD intended to offer the exhibits. She could have subpoenaed the authors as witnesses. Therefore, mother has failed to establish that admitting the exhibits based on foundation provided by social workers deprived mother of her right to cross-examine the authors of the exhibits.
In re Children of L.D., 2005 WL 526734, *8 (unpublished opinion). Similarly, in this case, both Mother and Father were aware before the adjudicatory and dispositional hearings that the State intended to offer the hearsay statements. Thereafter, parents could have called the children to cross-examine them but chose not to do so. Therefore, they were not deprived of the opportunity to cross-examine.

The Least Restrictive Alternative Available in the Best Interests of the Children
[¶ 21.] Mother and Father finally argue that termination of parental rights was not the least restrictive alternative available in the best interests of the children. "Our standard of review is `whether the trial court's ultimate finding  that clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests  was clearly erroneous.'" In re A.S., 2000 SD 94, ¶ 19, 614 N.W.2d 383, 386 (quoting In re J.Y., 502 N.W.2d 860, 862 (S.D.1993)). The trial court's determination as to "the least restrictive alternative commensurate with the best interests of the child is an issue of fact." Matter of A.H., 421 N.W.2d 71, 75 (S.D.1988) (citing People in Interest of K.C., 414 N.W.2d 616, 620 (S.D.1987)). "Although it is necessary for the trial court to enter its final determination of the least restrictive alternative (in the best interests of the child) as a conclusion of law, it is nonetheless an ultimate finding, subject to [the] clearly erroneous standard of review." Id. (citing People in Interest of K.C., 414 N.W.2d at 620).
[¶ 22.] We first consider the best interests of the children. In this case, there is substantial evidence that the children were abused. E.A. Jr. told numerous counselors and interviewers that his mother hit him inappropriately. Additionally, S.A. and A.A. reported incidents of abuse at the hands of their parents. The parents, however, denied that abuse ever took place, denied there was any current domestic abuse between the two of them, and maintained their denial even when confronted with DSS's irrefutable evidence.
*681 [¶ 23.] Furthermore, all of the professionals involved in this case believed that it would not be in the best interests of the children to return to the home. For example, Ms. Olson-Larson believed that the parents' continued denial, despite the children's repetitive statements of abuse, would have a negative impact as it would send a message to the children that they are liars. The parents' denial also prevented Ms. Olson-Larson from conducting family therapy with the parents and the children. This inability to talk about the abuse within the family also prohibited the children from reporting any further incidents because, as Ms. Olson-Larson opined, the abuse would be seen as a secret to be kept in the family. Finally, the continued denials prevented the parents from learning from the numerous services that would help them become a healthier family.
[¶ 24.] Consequently, Dr. Sivesind, Mr. Patzlaff, and DSS witnesses opined that it was not in the children's best interests to be returned to the home. Although Dr. Sivesind initially stated that there was no reason why Mother and Father could not be successful parents in the future, this statement was made without the knowledge of the family's substantial history of domestic abuse, S.A.'s allegation of sexual abuse, and the parents' unstable marriage. After becoming aware of these facts, Dr. Sivesind changed his opinion and stated that further services would not be beneficial and that DSS should not place the children back in the unsafe home. Similarly, Dr. Pribyl recommended that Father should not regain custody of the children especially considering his denial of S.A.'s sexual abuse allegation, which he believed would put S.A. at risk for further abuse that she would not report. Mr. Patzlaff opined that the children would be in "great danger" if they were returned to the parents as their steadfast denial prohibited them from engaging in any real healing. Mr. Patzlaff concluded "that the only viable option" for the safety of the children was to terminate parental rights. Finally, a DSS witness indicated that the parents' denial prevented them from providing a stable home and meeting their basic needs. The DSS witness further indicated that the abuse would likely continue in light of Mother's statement that this was all E.A. Jr.'s fault and when the children got home, Mother was going to sit down with them and find out why they were lying and who told them to lie. Considering all of the evidence, we agree with the trial court that it would not be in the best interest of the children to return them to a home where the physical abuse was denied, the parents believed their conduct was acceptable, the parents were unable to improve their skills, and the unacceptable conduct was likely to continue.
[¶ 25.] With respect to the least restrictive alternative, Mother and Father contend that they complied with all of DSS's requirements but were not given the opportunity to demonstrate what they had learned from the counseling and therapy sessions.[10] Thus, they argue that DSS did not make reasonable efforts to return the children to the home as required by *682 SDCL 26-8A-21.[11] Although this statute requires DSS to make reasonable efforts, "[e]xhaustion of every possible form of assistance is not required." People in Interest of T.G., 1998 SD 54, ¶ 21, 578 N.W.2d 921, 924 (citations omitted). Rather, "[i]n the event that counseling and therapy fail to improve parenting skills, termination of parental rights is justified." Matter of A.H., 421 N.W.2d at 76 (citations omitted). Furthermore, "[w]hen all reasonable attempts and assistance fail, no narrower alternative remains." Id. (citation omitted).
[¶ 26.] Here, unlike some abuse and neglect cases, Mother and Father did cooperate with DSS in fulfilling a vast majority of the requirements imposed upon them. However, due to their denials, they were unable to benefit from the counseling and other services offered. For example, parents completed two anger management assessments, but both assessments indicated the parents were being untruthful. Similarly, after being placed in the Family Violence Project (FVP), they told DSS that the classes did not help because they did not abuse their children or each other. Most importantly: 1) Dr. Sivesind, who administered the psychological evaluations, testified that in his opinion classes and therapy would not provide any assistance to Mother and Father as they were without a basis to start from because they would not be truthful in regard to their prior abusive conduct; 2) Dr. Pribyl testified that while he could not be certain, he believed that S.A.'s sexual abuse allegation was truthful; 3) Ms. Ritzman, a therapist at the Rape and Domestic Abuse Center, believed that Mother was minimizing Father's abuse and Ms. Ritzman was very concerned about Mother not believing S.A.'s sexual abuse allegation; 4) Ms. Konyek, who counseled the joint marriage sessions, testified that the parents denied current domestic abuse; 5) Mr. Patzlaff, who the trial court described as "a clinical social worker with over 20 years of working with families and children and a bias toward thinking families should be reunified if at all possible," testified that due to the parents' steadfast denial of abuse, the parents would continue to engage in the same behaviors; 6) Ms. Kleinschmidt, the family's DSS case manager, found that the parents were dishonest and failed to make a good faith effort to change their behavior for the safety of their children; and 7) all of the professionals that provided their services to the parents shared Mr. Patzlaff's concern that the parents' steadfast denial prohibited them from engaging in any real healing.
[¶ 27.] Considering the foregoing evidence, the parents' denials made the offered services unsuccessful, and "[t]ermination is appropriate where services are *683 unaccepted or unsuccessful." People in Interest of T.G., 1998 SD 54, ¶ 22, 578 N.W.2d at 924 (citation omitted). Because the evidence reflects that the numerous offered services would not reduce the risk of abuse, there was no less restrictive alternative that would ensure the well-being of the children.
[¶ 28.] Affirmed.
[¶ 29.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.
NOTES
[1] Mother and Father argue that the children's statements are inconsistent with the allegations of abuse. First, S.A. revealed that Father had smashed A.A.'s glasses, and A.A. agreed even though she did not have prescription glasses or sunglasses. Also, when E.A. Jr. voluntarily told Betty Lundgren, a counselor at the Children's Inn, that his mother hit him and lifted his shirt to show his bruises, S.A. and A.A. began laughing. Ms. Lundgren described the laughter as "almost like hysterical laughing."
[2] Although S.A. revealed abuse during the counseling sessions, as the dispositional hearing grew near, S.A. told Ms. Olson-Larson that if she went home and was abused again, she would not tell anyone about it as she would rather be home and abused than separated from her family.
[3] Other incidents of abuse documented by DSS included:

1) An incident on 1/22/95 where [Father] hit [Mother] in the mouth, apparently because she was unable to get one of their children to stop crying. [Father] was arrested and convicted of simple assault. He received a suspended 180 day jail sentence.
2) A report made on 7/13/95 in Denison, Iowa, where [Mother] went to the police station to complain that [Father] assaulted her, hit her in the eye and jaw, and pulled her hair. [Father] was again arrested, pled guilty, and was sentenced to 30 days in jail, with 27 suspended.
3) On 3/6/96, [Mother] called 911 in Denison, Iowa, to report several assaults in the previous week, including being kicked, pushed, and shoved down the steps of her ... house. [Father] was arrested but the charges were dismissed.
4) On 3/7/98, a domestic assault was reported in Marshall, Minnesota, but DSS was unable to get any information about the details.
[4] Mother and Father completed two anger management assessments, which noted that the parents were untruthful. Mother and Father also denied that there was any domestic abuse problem. Dr. Scott Pribyl, a psychologist specializing in sexual abuse, opined that Father was lying in denying S.A.'s sexual abuse allegations, although he could not be completely sure. All of the professionals believed that the children should not be returned to the home. Even Morris Patzlaff, an independent social worker, concurred. He observed one of the parental visitations and reviewed the file. He opined that Mother may have been subconsciously associating E.A., Jr. with Father because E.A., Jr. was born during a period of abuse between the parents, E.A., Jr. resembled Father in appearance, and he had Father's name. This association and E.A., Jr.'s Attention Deficit Hyperactivity Disorder led Mr. Patzlaff to believe that E.A., Jr. would continue to be a victim of abuse if he were returned to the home.
[5] For example, see supra n. 1.
[6] At the adjudicatory hearing, Father objected to the testimony of Officer Johnson and Principal McNamara regarding E.A. Jr.'s statements about his injuries. Father also objected to the testimony of Ms. Van Ormer regarding E.A. Jr. and S.A.'s statements about Mother and Father abusing E.A. Jr. At the dispositional hearing, Father objected to Ms. Brazil's testimony concerning S.A.'s statements of physical and sexual abuse and to Ms. Olson-Larson's testimony concerning the statements E.A. Jr., S.A., and A.A. made during counseling.
[7] At oral argument, Father's attorney was asked if the trial court erred in applying the evidentiary rules of hearsay. He responded:

I think under the hearsay rules, the rules of evidence, that there is a statute that allows these statements in.... [S]o my only objection and my only problem with it is the parents did not have the right to confront. I think it is a separate issue.
[8] Several recent cases have reached the same conclusion. See In re April C., 131 Cal.App.4th 599, 611, 31 Cal.Rptr.3d 804, 811-12 (2005) (stating "the Sixth Amendment right to confrontation does not apply to parties in civil proceedings, including juvenile dependency proceedings"); In re C.M., 351 Ill.App.3d 913, 916-17, 286 Ill.Dec. 839, 842, 815 N.E.2d 49, 52 (2004) ("This court has previously held that a proceeding under the Juvenile Act constitutes a civil proceeding  meaning that no sixth amendment right to confront witnesses is implicated."); Commonwealth v. Given, 441 Mass. 741, 747, n. 9, 808 N.E.2d 788, 794 n. 9 (2004) ("The Crawford case has no direct bearing on this case, because, as we have made clear, the confrontation clause does not apply to civil commitment proceedings.") (citation omitted); In re Children of L.D., 2005 WL 526734, *7 n. 3 (Minn.Ct.App.) (unpublished opinion) (reasoning that termination proceedings are civil proceeding, thus, Crawford does not apply); In re D.R., 616 S.E.2d 300, 303 (N.C.Ct.App.2005) (explaining that "the Sixth Amendment is not applicable to this [termination of parental rights hearing] as it is a civil action").
[9] Attorney: ... Obviously, I don't have the children here. They are kept out of this process by statute of [SDCL] 19-16-39. You can take their hearsay statements and they can be admitted but only if the Court also finds that the statements have sufficient indicia of reliability....
The Court: I was interested in your comment about the children were excluded by statute. There is nothing to prevent either the State or the parents here from calling the child as a witness, is there?
Mother's Attorney: I guess I meant that the statute allows them to be excluded by letting the hearsay in. I don't know of a law that says you can't bring them in here although I have never seen that.
The Court: I probably wouldn't bring a three-year-old in most cases but a nine or ten-year-old might be old enough to come to court to testify certainly. I have had them testify in my court before.
Mother's Attorney: Well, if the Court wants to hear from [E.A. Jr.], I certainly wouldn't oppose recessing for additional evidence.
The Court: Just as I told the State this was their opportunity to present their evidence, this was your opportunity to present evidence.
[10] Mother and Father argue that they were not able to demonstrate what they learned because DSS did not provide any home based services. While home based services may be useful in some cases, the parents' denial of any misconduct and half-hearted effort to learn from the services DSS provided would have made any effort to provide the home based services futile. It was highly unlikely that, given the parents' denials, services provided in the home in the presence of the parents would have provided a different outcome.
[11] SDCL § 26-8A-21 further provides, in pertinent part:

Reasonable efforts to prevent the necessity for removal of a child from the home of the child's parents, guardian, or custodian and reasonable efforts to return the child to the home mean provision by the department of any assistance or services that:
(1) Are appropriate for the child's parents, guardian, custodian, or any other caretaker family of the child existing at the time of removal or possible return of the child, including instruction on parenting;
(2) Are available pursuant to the comprehensive plan of preventive services of the department;
(3) Could be made available without undue financial burden on the department; or
(4) Would have a significant likelihood of protecting the child from substantial danger to the child's physical health or from severe emotional damage while enabling the child to remain in the home or to be returned to the home.