#29586-a-SRJ
**2022 S.D. 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE PEOPLE OF THE STATE OF SOUTH DAKOTA
IN THE INTEREST OF L.N., Minor Child,
and concerning K.N. and M.S.B., Respondents.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SANDRA HOGLUND HANSON
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

COURT ROPER
Special Assistant Attorney General
Department of Social Services
Pierre, South Dakota                         Attorneys for petitioner and
                                             appellee, State of South Dakota.


KRISTI JONES of
Dakota Law Firm, Prof. L.L.C.
Sioux Falls, South Dakota                    Attorneys for respondent
                                             mother and appellant.

* * * *

CONSIDERED ON BRIEFS
SEPTEMBER 7, 2021
OPINION FILED **02/09/22**

#29586

JENSEN, Chief Justice

[¶1.] The Department of Social Services (DSS) filed an abuse and neglect petition against Mother and Father involving the minor child, L.N. (DOB: 07/23/2011). The case proceeded through adjudication and dispositional hearings with the court entering a final order terminating Mother and Father's parental rights on December 17, 2020. Mother appeals, arguing the State failed to provide active efforts for reunification, that termination of her parental rights was not the least restrictive alternative, and that her due process rights were violated when termination proceedings occurred while she was mentally incompetent. We affirm.

## Facts and Procedural History

[¶2.] L.N. is eligible for enrollment with the Oglala Sioux Tribe (Tribe), based upon Father's enrollment with the Tribe. Accordingly, the Indian Child Welfare Act (ICWA) applies. The Tribe was notified of this action in accordance with ICWA and neither participated nor intervened in the proceedings.

[¶3.] Prior to the commencement of these proceedings, DSS received three abuse and neglect referrals involving Mother. On January 24, 2013, DSS was informed that Mother, who was under the influence of methamphetamine and alcohol, violently assaulted Father in L.N.'s presence. L.N. was placed in DSS's custody but was returned to Mother's custody on February 8, 2013. DSS substantiated emotional abuse of L.N. by Mother.

[¶4.] DSS received another referral on December 4, 2014, concerning an incident when Mother choked her own mother in L.N.'s presence. L.N. was removed

-1-

from Mother's care and remained in DSS custody until August 31, 2015, when she was returned to Mother's custody.

[¶5.]     DSS received a third referral on November 23, 2016, concerning Mother's alleged physical abuse of L.N. after L.N. arrived at school with a bloody nose and black eye. L.N. told police officers and Child Protective Services (CPS) that Mother had hit her the night prior. DSS assumed custody of L.N. for approximately eighteen months. L.N. returned to Mother's custody on March 9, 2018.

[¶6.]     In March 2019, L.N. disclosed claims of physical abuse by Mother. Law enforcement initially spoke to L.N. at school and later visited Mother's home. Janni Warne, a Family Service Specialist at DSS, joined law enforcement at Mother's home to conduct an Initial Family Assessment (IFA). When L.N. arrived home from school, she told Specialist Warne that Mother had physically abused her by hitting L.N.'s forehead with a wooden spoon and covering her mouth and nose, which restricted her breathing. Mother admitted she put her hand on L.N.'s mouth to quiet L.N. but denied restricting L.N.'s airflow. In response to L.N.'s report, Mother told L.N. that Mother would be going to jail for thirty-five years. L.N. was visibly upset by this comment and stated she loved her mom but was scared and did not want to be at home due to Mother's behavior. Mother originally claimed she did not know it was wrong to tell L.N. she was going to jail for thirty-five years, then later denied making the statement altogether, and eventually admitted to making the statement.

[¶7.] On the same day as the home visit, Specialist Warne put a Present Danger Plan (PDP)[1] in place. L.N. was placed with her maternal grandfather and step-grandmother. On April 5, 2019, DSS held a rapid response meeting to discuss safety concerns regarding the situation. Mother stated she lacked patience with L.N. and had explosive behaviors once a month. Mother was unable to recall what she said or did during those times but noted she felt agitated, hyper, and panicked.

[¶8.] DSS filed an abuse and neglect petition on April 26, 2019. Lynn Plucker, a Family Service Specialist at DSS, was assigned to work with the family. A temporary custody hearing was scheduled for April 30, 2019. Mother requested, and was granted, a continuance to discuss her options with her attorney. The hearing was rescheduled for May 14, 2019. At the hearing, Mother denied the petition and requested physical custody of L.N. The circuit court denied Mother's request and placed temporary legal and physical custody of L.N. with DSS. DSS placed L.N. with her maternal grandparents.

[¶9.] DSS scheduled weekly visits between Mother and L.N. Mother attended visitation consistently throughout the proceedings. Although the visits were generally appropriate, staff at the visitation center stayed in the room to redirect the conversation when needed. During two of the visitations, Mother

---

1. A PDP is an "immediate, short term plan to keep the child(ren) safe when they have been identified as being in danger because of the actions of their caretaker(s). A PDP is an alternative to placing children in foster care and is developed with the input from the child(ren)'s caretakers." South Dakota Department of Social Services, *Present Danger Plan Frequently Asked Questions for Present Danger Plan Providers*, https://dss.sd.gov/formsandpubs/docs/ABUSE/DSSCP504_present_danger_plan.pdf (last updated December 2018).

required this assistance. In January 2020, Mother was struggling to maintain her composure and verbally aggressive to staff during the visit. Police arrived on site, and the visit was prematurely terminated. In response, Mother falsely told L.N. that she was being sent to prison. In October 2020, Mother had a panic attack during a visitation. L.N. struggled after the visitation as old memories of abuse resurfaced. L.N. stated that she did not want to make her mom mad and that she feared her mom would harm her again.

[¶10.] In May 2019, Specialist Plucker directed Mother to seek counseling and suggested several counselors. Mother refused and indicated she would find her own counselor. Mother began counseling with Kristie Hamilton in May 2019. Shortly thereafter, Mother contacted DSS and requested funding for counseling. DSS contacted Hamilton and was told that Mother needed a higher level of care than Hamilton could provide. DSS offered assistance in obtaining a new counselor for Mother, but Mother refused assistance and again indicated she would find her own counselor. Mother then began counseling with Crystal Kapperman but completed only a few sessions with her.[2]

[¶11.] Specialist Plucker attempted to discuss a case plan with Mother throughout June 2019. Mother often spoke in incoherent and conflicting sentences. She would say something to Specialist Plucker and when asked to repeat it, Mother would deny having made the statement. Mother spoke of dead men breaking into her home and claimed that Koreans were attempting to take L.N. Mother admitted

---

2. Kapperman left the community counseling clinic after finishing her pre-graduate internship. Mother's files were transferred to Faith Carlson, a postgraduate student, who was brought on to support existing patients.

to using methamphetamine and was often agitated. Despite multiple attempts by DSS to review Mother's case plan with her, Mother often became frustrated and would request that DSS leave. Specialist Plucker and Mother never completed a full, in-person case plan review. Mother eventually requested the case plan be mailed to her, which DSS did.

[¶12.] Specialist Plucker obtained funding for Mother's counseling and scheduled a mental health evaluation with Southeastern Behavioral Health.[3] In August 2019, Mother began counseling with Faith Carlson. Mother's sessions were sporadic—often whenever Mother showed up. Carlson attempted to make room in her schedule for Mother whenever she appeared.

[¶13.] Mother appeared with counsel for an adjudicatory hearing on August 8, 2019. Mother entered into a written stipulation for adjudication, admitting that L.N. was subjected to an environment that was injurious to her welfare. After advising Mother of her rights, the nature of the allegations in the petition, and that a disposition of termination could be entered, the court accepted Mother's admission and adjudicated L.N. to be abused and neglected.

[¶14.] Mother completed a new mental health evaluation with Southeastern Behavioral Health on September 11, 2019. Mother continued to tell Specialist Plucker about dead men entering her home and her belief that the government was

---

3.    Specialist Warne testified that Mother had recently completed a mental health evaluation prior to DSS getting involved in the incident leading to this proceeding. Specialist Warne reviewed the evaluation and spoke to Mother about Mother's mental health. Because the evaluation was recent, and only counseling was recommended, DSS did not take any additional steps at that time.

watching her. Specialist Plucker requested Mother submit to a urinalysis (UA) on September 11, 2019. Mother refused and told Specialist Plucker that she may be positive for drugs other than marijuana. Two days later, Mother admitted she was using methamphetamine and submitted to a UA test, which was positive for methamphetamine. In total, Mother was requested to submit to approximately thirteen UA tests over the course of this case. Mother refused UA testing six times, had four negative tests, and three positive tests.

[¶15.]     In October 2019, L.N.'s maternal grandparents, who had physical custody of L.N., requested that Specialist Plucker conduct a welfare check on Mother. Mother was not suicidal but continued to speak about government conspiracies, which often included conspiracies involving DSS. Because Avera Behavioral Health determined that Mother was not a danger to herself or others, she was not placed on a mental health hold.

[¶16.]     In November 2019, a psychological evaluation was scheduled with Dr. Langenfeld. Dr. Langenfeld contacted Specialist Plucker to request additional time to complete the evaluation due to Mother's scattered thoughts while testing. Dr. Langenfeld ultimately recommended Mother seek chemical dependency treatment and psychiatric treatment with long-term counseling, preferably with the same counselor. In December 2019, Specialist Plucker enrolled Mother in a chemical dependency group at the Carroll Institute. Mother attended the group sporadically. Mother failed to complete the program and was eventually discharged for lack of attendance and mental instability.

[¶17.] Throughout January and February 2020, Mother believed she did not need any psychiatric appointments and refused to attend; however, Mother continued to see Carlson. On February 6, 2020, Mother requested Specialist Plucker to attend a counseling session with her. Carlson was not available, and Mother saw a different counselor. Mother made statements about wanting to get away and not wanting to be around anymore. The counselor believed Mother was suicidal and called the police. Mother was taken to Avera Behavioral Health and assessed, however, an emergency hold was not initiated, and she instead visited with an on-site emergency psychiatrist. The Avera psychiatrist followed-up with Mother a few days later, and Mother admitted to ingesting methamphetamine on February 6, 2020. Mother also tested positive for methamphetamine on February 19, 2020.

[¶18.] In March 2020, Specialist Plucker enrolled Mother in a twelve-week outpatient drug treatment program at the Carroll Institute. Due to COVID precautions, the program was conducted virtually. Mother attended some sessions but often claimed her computer or computer camera was broken. Citing lack of attendance and mental instability, the Carroll Institute terminated Mother's enrollment in mid-April 2020. DSS requested that a final dispositional hearing be scheduled, and the circuit court scheduled the hearing for June 2020. The circuit court also ordered Mother to submit to a competency evaluation. The evaluation was completed by Dr. Price on May 27, 2020. Dr. Price noted that Mother "demonstrates serious and pervasive thought dysfunction. She experiences delusions and has strong beliefs that others seek to harm her. She's very suspicious

and distrustful." Dr. Price deemed Mother incompetent. The circuit court then appointed a guardian ad litem for Mother. The court also continued the final dispositional hearing for ninety days.

[¶19.] Specialist Plucker, in April 2020, attempted to connect Mother with Avera Medical Group University Psychiatry Associates but was not able to schedule an appointment without Mother's permission. Specialist Plucker did, however, obtain the necessary paperwork to be completed by Mother for admission. Mother and Specialist Plucker filled out the paperwork together at Mother's home, but a form was missing when it was delivered to Avera. Despite attempts by Specialist Plucker to have Mother fill out the missing form, the paperwork remained incomplete.

[¶20.] Mother's guardian ad litem and Specialist Plucker collectively began working to secure other competency restoration programs for Mother. Mother was denied enrollment in various programs at Southeastern Behavioral Health due to bed availability or ineligibility. Mother was also denied enrollment at the Human Services Center. Mother may have been eligible for enrollment at Southeastern's Summit location but would have been required to switch counselors. Mother's guardian ad litem and Specialist Plucker determined Mother should remain with Carlson, rather than switch counselors, due to Mother's general distrust, conspiratorial thinking, and delusions.

[¶21.] In August 2020, Specialist Plucker obtained consent from Mother's guardian ad litem and obtained an appointment for Mother with a psychiatrist at Avera. Mother was prescribed Risperdal for schizophrenia, and Specialist Plucker

offered Mother transportation to pick up her prescription as well as funding for the medication. Mother refused assistance from Specialist Plucker but filled the prescription. The court also continued the final dispositional hearing scheduled for August 2020 to December 2020.

[¶22.] Between September and October 2020, Mother took Risperdal as prescribed. Mother's delusions drastically decreased, and Carlson noted that "[t]he mental status exam that was provided before and after the medication was two different people in my professional opinion." By early October, however, Mother refused to take Risperdal. Mother's delusions worsened, and Carlson had Mother involuntarily committed, fearing for Mother's safety. Methamphetamine was discovered in Mother's belongings during her committal, and Mother was arrested. Mother subsequently terminated her sessions with Carlson.

[¶23.] On October 6, 2020, the circuit court denied Mother's request for a third continuance of the final dispositional hearing. On November 9, 2020, Mother began seeing Dr. Heather Chester-Adam, a psychiatrist at Avera. Mother's attendance was sporadic, and Mother failed to attend appointments leading up to the final dispositional hearing. Mother also failed to provide a UA test on October 15, 2020. Despite Mother's minimal cooperation, Specialist Plucker attempted to enroll Mother in a chemical dependency program.

[¶24.] A final dispositional hearing was held on December 16–17, 2020. Specialist Plucker and Specialist Warne testified at the hearing concerning their efforts to provide services to Mother. Specialist Plucker testified that she believed Mother had not cooperated in addressing her mental health issues because Mother's

"drug use and . . . her lack of follow[-]through with doctor recommendations limited her [ability to] follow[-]through with DSS recommendations." The State offered various DSS reports and evaluations, treatment center discharge summaries, CASA reports, urinalysis statistics, and a mental health competency evaluation, among other documents.

[¶25.] The State called Michelle VanDenHul, L.N.'s counselor, and Luke Yellow Robe, an ICWA expert. VanDenHul testified that permanency and security are critical for L.N. and that L.N. feels safe with her grandparents. During their sessions, L.N. told VanDenHul how Mother emotionally and physically abused her and how much it frightened her.

[¶26.] At the hearing, Yellow Robe testified that L.N.'s placement with her maternal grandparents is consistent with ICWA placement preferences. Yellow Robe stated that in his opinion, DSS made active efforts to reunify the family, and that they had offered rehabilitative programs to prevent the breakup of the Indian family, but those efforts were unsuccessful. Specifically, he noted that "[w]e've seen [DSS] provide the active efforts to assist Mom and we're still – we're really in all reality still where we [were] when the child first came into care." He stated that he believed returning L.N. to Mother would be "injurious, maybe even bo[ ]rder o[n] dangerous to return this child who's in a solid[,] competent placement at the time." During cross-examination, Yellow Robe acknowledged the bond between L.N. and Mother. However, Yellow Robe ultimately concluded L.N. should not be returned to Mother's care as it would likely result in serious emotional or physical damage

because L.N. experienced trauma in Mother's care and expressed a fear of returning to Mother.

[¶27.]	On January 5, 2021, the court entered findings of fact and conclusions of law, issued a final dispositional order terminating Mother's parental rights over L.N., and granted DSS full adoptive custody of L.N. The court noted that L.N. had been in DSS's custody since March 2019. The court found beyond a reasonable doubt that DSS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and those efforts were unsuccessful. The court concluded that termination of Mother's rights was supported by the evidence, including testimony from an ICWA expert, and that continued custody would likely result in serious emotional or physical damage to L.N.

[¶28.]	Mother appeals, raising three issues:

1. Whether the circuit court erred in finding beyond a reasonable doubt that DSS provided active efforts to reunify the family.

2. Whether the circuit court clearly erred in finding beyond a reasonable doubt that termination of parental rights was the least restrictive alternative in the best interests of the minor child.

3. Whether the circuit court abused its discretion, or violated Mother's due process rights, in denying Mother's request to continue the termination proceedings while Mother was mentally incompetent.

## Analysis and Decision

### 1.   Whether DSS provided active efforts.

[¶29.]    Mother argues that the circuit court erred in finding that DSS provided active efforts to assist in reunification with L.N.  Mother claims that she consistently visited L.N. and that her severe mental illness was immediately apparent, yet DSS merely suggested and monitored her counseling rather than actively assisting her with her mental health.  In particular, Mother argues that it took approximately seventeen months before she was provided psychotropic medication and that DSS failed to provide sufficient support for her medication management.  Mother also argues that "the only service DSS set up pursuant to Dr. Price's recommendation was a chemical dependency evaluation."  Overall, Mother claims DSS took a passive role and that the circuit court erred by determining DSS's efforts were reasonable and active although unsuccessful.

[¶30.]    ICWA provides that "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d).  DSS must prove, beyond a reasonable doubt, that active efforts were made to reunite and rehabilitate the Indian family.  25 U.S.C. § 1912(f).  Whether DSS provided active efforts "is a mixed question of law and fact" that we review de novo. *People ex rel. P.S.E.,* 2012 S.D. 49, ¶ 15, 816 N.W.2d 110, 115.  "[T]he 'active efforts' requirement of § 1912(d) imposes a higher standard than the 'reasonable efforts' of SDCL 26-8A-

21." *Id.* ¶ 22, 816 N.W.2d at 117. "Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2.

[¶31.] Active efforts require DSS to take the parent through the steps of the case plan rather than requiring the parent to perform the plan on his or her own. *People ex rel. S.H.E.*, 2012 S.D. 88, ¶ 21, 824 N.W.2d 420, 426. However, services and aid cannot be forced upon uncooperative, unwilling parents. *In re V.D.D.*, 278 N.W.2d 194, 197 (S.D. 1979) (noting that a mother's failure to complete an alcohol treatment program justified parental termination). "Where efforts to aid or counsel parents by the use of social services proves unavailing, termination of parental rights is justified." *In re W.G.*, 1999 S.D. 85, ¶ 19, 597 N.W.2d 430, 434 (citation omitted). "DSS is not required to exhaust every possible form of assistance . . . ." *In re J.B.*, 2008 S.D. 80, ¶ 13, 755 N.W.2d 496, 500. *Accord People ex rel. of P.B.*, 371 N.W.2d 366, 373 (S.D. 1985) (noting in an ICWA case that "not every conceivable form of assistance must be attempted and found wanting before termination of parental rights is justified"). Even when parents take steps toward reunification, termination may be appropriate if the parent is no closer to becoming a suitable placement. *P.S.E.*, 2012 S.D. 49, ¶ 28, 816 N.W.2d at 119 (holding that, although father completed DUI classes and enrolled in parenting and anger management classes, his efforts did not bring him closer to becoming a suitable placement than when the case was initiated).

[¶32.] The circuit court found the State's witnesses to be credible and that the State had made active efforts to reunify the Indian family. It noted DSS

consistently contacted and aided Mother over twenty months, but that Mother failed to cooperate or take any meaningful steps toward reunification. DSS provided Mother with referrals, scheduled appointments, provided transportation, and funding, yet Mother failed to complete programs and instead continued to use methamphetamine. DSS also assisted Mother in obtaining psychotropic medication. Mother saw improvement while taking the medication but refused to continue taking it within a short time after starting the regimen. Further, Mother continued using methamphetamine throughout the proceedings.

[¶33.]     The record supports the circuit court's determination. DSS provided many of the active efforts listed in 25 C.F.R. § 23.2, including: conducting an IFA and PDP; tribal notification; compliance with ICWA placement preferences; case plan reviews; supporting regular visits between Mother and L.N.; referrals to counselors; monitoring progress and participation in various services; consideration of alternative ways to address Mother's mental health issues after ineligibility in various programs; offering Mother transportation and vouchers; providing L.N. with counseling; and consulting an ICWA expert. The court correctly determined that DSS made active efforts to obtain services to help Mother address her problems and reunify her with the child. Unfortunately, because of Mother's choices, many of these services were refused or ineffective. The circuit court did not err in finding that DSS made active efforts to reunify L.N. with Mother.

### 2.     *Least restrictive alternative in the best interests of the minor child.*

[¶34.]     Parental rights may be terminated if it is in the "best interests of the [child]" and is "the least restrictive alternative available." *People ex rel. P.K.*, 2006

S.D. 17, ¶ 17, 711 N.W.2d 248, 254. Whether these requirements are met is a question of fact. *Id.* (citation omitted). "We review the trial court's findings of fact under the clearly erroneous standard; therefore, they will not be set aside unless 'we are left with a definite and firm conviction that a mistake has been made.'" *Id.* (citation omitted). "The best interests of the child are viewed from the child's, not the parents', perspective." *In re A.S.*, 2000 S.D. 94, ¶ 19, 614 N.W.2d 383, 386.

[¶35.] Mother emphasizes the bond she and L.N. share. She points out that she consistently visited L.N. and that L.N. was excited for, and affectionate during, visits with Mother. Mother also argues that "[e]stablishing a guardianship with maternal grandparents would protect [L.N.]'s interest in stability while avoiding the drastic step of [terminating] Mother's parental rights because Mother has a reasonable likelihood of regaining competency if treated appropriately." In response, the State argues that the circuit court properly found that termination was the least restrictive alternative in the best interests of L.N. and that this determination is supported by the record and the credibility assessments of the court.[4]

---

4.  The State additionally relies upon SDCL 26-8A-26.1(8) and (9), arguing that the least restrictive alternative does not apply when the circuit court finds a specific, good cause basis for termination under this statute. Subsections (8) and (9) of SDCL 26-8A-26.1 provide that a "court may find that good cause exists for termination of parental rights of a parent who:

    . . .

    8) Has exposed the child to or demonstrated an inability to protect the child from substantial harm or the risk of substantial harm, and the child or another child has been removed from the parent's custody because the removed child was adjudicated abused and neglected by a court on at least one previous occasion; [or]

    (continued . . .)

-15-

[¶36.]     When numerous offered services would not reduce the risk of abuse, there may be no less restrictive alternative other than termination. *In re S.A.*, 2005 S.D. 120, ¶ 27, 708 N.W.2d 673, 683. A mother's "promises to conform to the standard of care for [her] children do not carry as much weight as [her] past actions of not properly caring for [her] children." *S.H.E.*, 2012 S.D. 88, ¶ 32, 824 N.W.2d at 429 (citation omitted). The circuit court found that "[g]iven Mother's history and condition at the time of the December 2020 hearing, her incompetency may continue until L.N. becomes an adult, and the Court is not aware of any reasonably-likely projected date upon which Mother is expected to regain competency . . . ." "We will

_____
(. . . continued)

> (9) Has exposed the child to or demonstrated an inability to protect the child from substantial harm or the risk of substantial harm, the child has been removed from the parent's custody on two separate occasions, and the Department of Social Services offered or provided family services on each of the two separate occasions the child was removed[.]"

> The State cites *People ex rel. L.S.*, 2006 S.D. 76, ¶ 33, 721 N.W.2d 83, 93, asserting that DSS is not required to provide reasonable efforts when certain aggravating circumstances exist under SDCL 26-8A-21.1 (a statute that parallels the circumstances listed under SDCL 26-8A-26.1). The State then acknowledges that in ICWA cases, even when aggravating circumstances are present, DSS must nevertheless provide active efforts toward reunification. *See People ex rel. J.S.B., Jr.*, 2005 S.D. 3, ¶ 17, 691 N.W.2d 611, 617. However, the State suggests that unlike the "active efforts" requirement in ICWA, the "least restrictive alternative" requirement is based on state law, not ICWA; and therefore, such requirement may be dispensed with under the circumstances set forth in SDCL 26-8A-26.1. This Court has not previously considered whether the specific additional grounds under SDCL 26-8A-26.1 providing good cause for termination excuses the required showing that termination is the least restrictive alternative. This issue was not raised below, and we need not decide the question here because we affirm the circuit court's finding that termination was the least restrictive alternative.

not force the child to wait for [her] parents to acquire parenting skills that may never develop." *People ex rel. D.T.*, 2003 S.D. 88, ¶ 23, 667 N.W.2d 694, 701.

[¶37.]     The record shows that Mother was not capable of providing a safe, stable home for L.N.  She has a long, well-documented history of substance abuse and mental health issues.  More problematic, Mother continued to use controlled substances, failed to complete chemical dependency programs, declined to fully engage in mental health programs offered to her, and refused to continue taking medication that appeared to be effective for treating her schizophrenia.  Mother remained an unsuitable placement throughout the proceedings due to worsening delusions.  Despite DSS's attempts toward reunification and rehabilitation, the court found that Mother was in no better position to parent L.N. than when the proceedings began.

[¶38.]     The evidence also shows that while L.N. enjoyed visiting her Mother, she expressed significant distress at the thought of returning to her Mother's care.  This was evident after the October 2020 visit, which was disrupted due to Mother's panic attack.  L.N. told her counselor how she worried Mother would harm her again and that there were not enough locks at home to keep Mother out.

[¶39.]     The record supports the circuit court's finding that termination of Mother's parental rights was the least restrictive alternative and in L.N.'s best interests.  Mother has failed to show clear err in the circuit court's findings.

### 3.     *Mother's incompetency.*

[¶40.]     Mother claims the circuit court abused its discretion when it denied her request for a continuance after she was deemed incompetent.  She further

claims that her procedural due process rights were violated when the court terminated her parental rights while she was incompetent.[5] Mother argues the continuance would have given her time to establish competency through participation in an in-patient or community competency restoration program. She contends that the Due Process Clause requires that she be restored to competency before proceeding with a termination hearing. The question of whether the circuit court violated Mother's procedural due process rights by terminating her parental rights while she was incompetent is one of first impression for this Court.

[¶41.] "A trial court's decision to grant or deny a continuance is reviewed under an abuse of discretion standard." *State v. Beckley*, 2007 S.D. 122, ¶ 20, 742 N.W.2d 841, 847. An abuse occurs when a court fails to justify the discretion exercised and such exercise is "clearly against reason and evidence." *Id.* (citation omitted). "The granting or refusing [of] a continuance rests in the sound discretion of the court below, and its ruling will not be reversed, except for the most cogent reasons." *Gaines v. White*, 47 N.W. 524, 525 (S.D. 1891). "[A]n alleged violation of a constitutionally protected right is a question of law . . . reviewed de novo." *State v. Carothers*, 2005 S.D. 16, ¶ 7, 692 N.W.2d 544, 546 (citation omitted). In this instance, the sole error claimed by Mother was that the circuit court violated her due process rights by proceeding to termination while she was incompetent. Thus, we review whether the court's refusal to grant a continuance of the final

---

5.    Mother was determined to be incompetent by Dr. Price on May 27, 2020. It is not clear that another competency evaluation was ever done, but there appears to be no dispute that Mother was incompetent at the time of the final dispositional hearing.

-18-

dispositional hearing violated Mother's due process rights without any deference to the circuit court.

[¶42.] The United States Supreme Court has stated that "state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394, 71 L. Ed. 2d 599 (1982) (quoting *Lassiter v. Dep't of Soc. Servs*, 452 U.S. 18, 37, 101 S. Ct. 2153, 2165, 68 L. Ed. 2d 640 (1981) (Blackmun, J., dissenting)). The "nature of the process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976)." *Id.* at 754, 102 S. Ct. at 1395. Those factors include "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." *Id.*

[¶43.] In the context of termination proceedings, the *Mathews* balancing test "requires that the court consider and balance (1) the parent's interest and (2) the risk of erroneous deprivation against (3) the government's interest." *Matter of M.M.L., Jr.*, 393 P.3d 1079, 1081 (Nev. 2017) (citing *Lassiter*, 452 U.S. at 27, 101 S. Ct. at 2153). Applying the first factor from *Mathews*, Mother had a significant and well recognized interest in parenting L.N. "[N]atural parents have a fundamental liberty interest in the care, custody, and management of their children." *S.A.*, 2005 S.D. 120, ¶ 15, 708 N.W.2d at 678 (citing *Lassiter*, 452 U.S. at 27, 101 S. Ct. at 2159–60); *see also Santosky*, 455 U.S. at 753, 102 S. Ct. at 1394–95. "Parents are

guaranteed procedural rights under the Fourteenth Amendment when parental rights are subject to termination[.]" *S.A.*, 2005 S.D. 120, ¶ 15, 708 N.W.2d at 678. For instance, before terminating parental rights in ICWA cases, the State must prove "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *People ex rel. A.B.*, 2016 S.D. 44, ¶ 16, 880 N.W.2d 95, 101 (citation omitted). Additionally, the State must present clear and convincing evidence that "termination is the least restrictive alternative commensurate with the best interest of the child." *Id.*

[¶44.] However, a parent's liberty interest in parenting a child is not without limits and may give way to the best interests of the child when abuse and neglect has been substantiated. *In re Z.Z.*, 494 N.W.2d 608, 610 (S.D. 1992); *People ex rel. E.D.J.*, 499 N.W.2d 130, 135 (S.D. 1993) ("The best interests of the child must prevail.") (citation omitted). This Court has long recognized that "[c]hildren are entitled to a stable, healthy environment *now*; they are not required to wait for a parent to acquire parenting skills that may never develop." *Z.Z.*, 494 N.W.2d at 610.

[¶45.] Notwithstanding these principles, Mother argues that her constitutional right to parent L.N. requires in all instances that she be restored to competency before the court may proceed with termination. While due process requires that a criminal defendant be restored to competency before trial, Mother does not cite any authority to support a bright-line rule that due process requires competency restoration before a parent's rights may be terminated in a child

dependency proceeding. Rather, we have held that "[p]rocedures determining the custody of dependent children are not criminal, are not quasi-criminal, but instead constitute a civil action, or a special proceeding of a civil nature." *S.A.*, 2005 S.D. 120, ¶ 17, 708 N.W.2d at 679 (citation omitted). In specifically rejecting a claim that a parent must be restored to competency before proceeding with termination proceedings, one court has stated, "termination cases do not involve the deprivation of '*physical liberty.*'" *A.M. v. Dep't of Child. & Fams.*, 223 So. 3d 312, 315 (Fla. Dist. Ct. App. 2017). Thus, termination "proceedings are not entitled to the protections of a criminal trial, because the procedures and goals in place in child dependency and termination proceedings are different than those for criminal prosecutions." *Id.*

[¶46.]     Mother failed to obtain competency despite efforts by DSS to assist Mother for more than six months after Dr. Price determined she was incompetent. During this time, Mother continued to use controlled substances and discontinued taking efficacious psychotropic medications. Given these circumstances, there was no indication that Mother's competency would be restored even if the termination proceedings were further delayed. Based upon this record, the first *Mathews* factor supports a determination that L.N.'s best interests in having a stable and secure home were paramount to Mother's interests in a further delay in the termination proceedings.

[¶47.]     The second *Mathews* factor requires that we consider the risk of error created by holding a termination proceeding while Mother was incompetent. Mother was represented by counsel throughout the proceedings and the court also

appointed a guardian ad litem to represent her after she was deemed incompetent.[6] She had the assistance of counsel and a guardian ad litem acting on her behalf throughout the final dispositional hearing. Counsel for Mother effectively cross-examined witnesses called by DSS and also called Mother's counselor to testify. These protections, along with the State's heightened burden of proving beyond a reasonable doubt that continued custody would result in serious emotional or physical damage to the child, and that termination was the least restrictive alternative by clear and convincing evidence, were adequate to guard against the risk of error in the proceedings. *See A.M.*, 223 So. 3d at 316.

[¶48.]     The third *Mathews* factor also favors the State based upon its substantial interest in ensuring a result that is consistent with the child's best interest after a child has been determined to have been abused or neglected. The State did not resist several continuance requests and there was no indication that Mother's mental health would improve even if the court indefinitely continued the final dispositional hearing. Another continuance would have left L.N. in continued uncertainty, contrary to her best interests. In the twenty-one months this case was pending, Mother continued to use methamphetamine, minimally cooperated with

---

6.     The appointment of a guardian ad litem is a significant factor to be considered in determining the risk of error. *See State ex rel. Juv. Dep't of Multnomah Cnty. v. Evjen*, 813 P.2d 1092, 1093 (Or. Ct. App. 1991). Further, additional safeguards may apply when an Indian child is involved. 25 U.S.C. § 1912. However, both ICWA and chapter 26-7A and 26-8A are silent on questions of whether a parent must be competent for termination proceedings or whether the court must appoint a guardian ad litem to assist a parent due to incompetency. Since the circuit court appointed a guardian ad litem for Mother, it is unnecessary to consider whether the absence of a guardian ad litem to represent an incompetent parent in termination proceedings necessarily gives rise to a due process violation.

counseling, and declined medication. This Court has continuously emphasized the importance of permanency and stability in considering the best interests of the child. *See D.T.*, 2003 S.D. 88, ¶ 23, 667 N.W.2d at 701. The continued "postponement of termination proceedings, for a fitness hearing or until the respondent could be restored to fitness, would further delay a child's interest in finding a permanent home." *In re Charles A.*, 856 N.E.2d 569, 573 (Ill. App. Ct. 2006). Such an indefinite postponement would frustrate the State's "*parens patria* interest in preserving and promoting the welfare of the child." *Id.*

[¶49.] Our conclusion is consistent with other jurisdictions, which have held that a parent's due process rights are not violated when parental rights are terminated while a parent remains incompetent. Applying the *Mathews* factors, several courts have held "that due process does not require a parent to be competent at the time of the termination proceeding." *A.M.*, 223 So. 3d at 317 (citing cases from five states that have held parental incompetency at the time of the termination proceeding is not a due process violation). In *A.M.*, the mother was deemed incompetent in an unrelated criminal proceeding and was then involuntarily committed days before the trial in the dependency case. *Id.* at 314. Although the mother requested a continuance, the court denied it and emphasized the child's need for finality and stability. *Id.* at 317 (noting that there was "no assurance that the mother would regain competence"); *accord M.M.L.*, 393 P.3d at 1082–83 (denying a continuance where the contesting parent was incompetent because the child's interest was of paramount concern); *In re R.M.T.*, 352 S.W.3d 12, 21 (Tex. App. 2011) (finding the child's need for permanency could not be

accommodated without proceeding while the parent was incompetent); *Charles A.*, 856 N.E.2d at 573 ("The postponement of termination proceedings, for a fitness hearing or until the respondent could be restored to fitness, would further delay a child's interest in finding a permanent home."); *In re N.S.E.*, 666 S.E.2d 587, 589 (Ga. Ct. App. 2008); *In re W.J.S.M.*, 231 S.W.3d 278, 283 (Mo. Ct. App. 2007).[7]

[¶50.]		We conclude, in considering the *Mathews* factors, that Mother has failed to establish a due process violation. Our decision aligns with other jurisdictions that have found a parent's due process rights are not violated when proceedings occur while a parent is incompetent. Mother has failed to cite any decision to support her claim that a due process violation occurred under the circumstances that exist in this case. Under the circumstances presented here, the circuit court did not violate Mother's due process rights in denying her request to continue the final dispositional hearing.

[¶51.]		We affirm.

[¶52.]		KERN, SALTER, DEVANEY, and MYREN, Justices, concur.

---

7.	*But see In re Alexander V.*, 613 A.2d 780 (Conn. 1992) (concluding the trial court violated a parent's due process rights by not granting a request for a competency evaluation); *Evjen*, 813 P.2d at 1092–95 (finding a due process violation where the trial court denied the parent's request for a guardian ad litem and proceeded with a parental right termination hearing in the parent's absence).